<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **Criminal Action No. 15-551 (ES)** |
| **v.** | **OPINION** |
| **IBRAHIM MCCANTS,** | |
| **Defendant.** | |

**SALAS, DISTRICT JUDGE**

Pending before the Court are Defendant Ibrahim McCants's motion to suppress and pretrial discovery motions. (D.E. No. 14). The motions are opposed. (D.E. No. 17). The Court decides the motions without oral argument. For the reasons stated herein, the Court DENIES in part and RESERVES in part McCants's motions.

**I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY**

This action stems from McCants's two-count indictment for possession with intent to distribute heroin and felon in possession of a firearm. (D.E. No. 1, Indictment).

The facts of the instant case are, for the most part, undisputed. On June 28, 2015, at approximately 2:30 p.m., the East Orange 911 emergency system received an anonymous call from a caller (the "Caller") claiming to witness a dispute involving domestic violence. (D.E. No. 14, Memorandum of Law in Support of Defendant's Motion to Suppress and Pretrial Discovery Motions ("Def. Mov. Br.") at 3; D.E. No. 17, Memorandum of Law of the United States in Opposition to Defendant's Pretrial Motions, ("Gov't Opp. Br.") at 4). The call occurred as follows:

Caller: Can I have the number to East Orange Police Department.

911: You need where?

Caller: East Orange Police Department.  It's [sic] emergency.

911: What's the problem?

Caller: This guy is out here beating up his girlfriend.  He's about to kill her.

911: Where's this at?

Caller: It's on Grove Street in East Orange.

911: Grove and—where on Grove?

Caller: Grove and, and, and like Williams Street.

911: What is he wearing?

Caller: He's wearing a red hat, with braids and he's beating her up really bad right now I wanna [sic] break—I wanna [sic] break it up but, I don't wanna [sic] do nothing.

911: No—you don't want to do that. Stay—hold on a second, ma'am.

(D.E. No. 14-1 Ex. A, June 28, 2015 911 Call ("911 Call") at 0:00:21-0:01:00).

As the 911 operator was dispatching the call, the Caller repeats that "he is beating her up really badly."  (*Id.* at 0:01:08-0:01:10).  The Caller goes on to state, "I think he has a gun."  (*Id.* at 0:01:30-0:01:32).  Following this statement, the Caller disconnects the call.

The 911 operator dispatched the call as follows:

911: Grove and William, Grove and William, right now from a caller, it's a male beating a female really badly, male has braids with a red hat. . . . Again, it's going to be Grove and William.  Male, female.  Male beating a female.  Male has braids red hat—at this time, I am advising the caller not to intervene . . . .  Now she is saying she believes he has a gun. . . . Red hat and braids.  Alright, the caller disconnected.

(*Id.* 0:01:02-0:01:44).

After hearing the 911 dispatch, Officer Moses Sangster was first to arrive on the scene near 146 Grove Street.  (Gov't Opp. Br. at 5; Def. Mov. Br. at 4).  Officer Sangster observed a man who fit the Caller's description of the accused walking with a woman and dispatched his location.  (Gov't Opp. Br. at 5; D.E. No 14-4, Ex. D, East Orange Police Dep't Supplementary Incident Report, Officer Sangster ("Sangster Report")).  This woman was later identified as Chelsea Fulton.  (Def. Mov. Br. at 1; Gov't Opp. Br. at 5).  Meanwhile, Officers Stephen Rochester and Cory Patterson also heard the dispatch and arrived at the scene within minutes.  (Gov't Opp. Br. at 5; Def. Mov. Br. at 4).  Upon their arrival, Officers Rochester and Patterson got out of their car, approached McCants, and directed him to stop and place his hands on the hood of a car.  (Gov't Opp. Br. at 5).

The officers subjected McCants to a pat down due to the "nature of the call for service."  (D.E. No 14-4, Ex. D, East Orange Police Dep't Supplementary Incident Report, Officer Rochester ("Rochester Report")).  Officer Rochester patted McCants down and felt a handgun inside McCants's fanny pack.  (Gov't Opp. Br. at 6; Rochester Report).  Officer Rochester opened McCants's fanny pack and found a loaded handgun inside.  (Gov't Opp. Br. at 6; Def. Mov. Br. at 4).  After discovering the gun, the officers arrested McCants.  (Gov't Opp. Br. at 6).  A search incident to the arrest revealed narcotics, including heroin.  (*Id.*).

Although the parties largely agree on the facts, there is a dispute as to Fulton and McCants's interaction and demeanor when the officers arrived.  The government contends that the couple was "yelling at each other" when the officers arrived.  (Gov't Opp. Br. at 5).  McCants submits, however, that he was not arguing with Fulton when the officers arrived on the scene.  (Def. Mov. Br. at 4).  McCants supports this position with an affidavit submitted by Fulton.  (D.E. No. 14-3, Affidavit of Chelsea Fulton).  McCants also points to the absence of any indication in the officers'

3

incident reports that the two were arguing; the reports seem to indicate that McCants was "speaking with a black female." (Rochester Report; Def. Mov. Br. at 4).

On October 20, 2015, a grand jury for the District of New Jersey sitting in Newark, New Jersey returned a two-count indictment against McCants for possession with intent to distribute heroin and felon in possession of a firearm. (D.E. No. 1, Indictment). On May 27, 2016, McCants filed the instant motion to suppress with accompanying pretrial discovery motions. (D.E. No. 14). The government opposes the motion. (D.E. No. 17).

On July 12, 2016, after the motion was ripe, the Court held a telephone conference. (*See* D.E. No. 19). During the telephone conference, the Court heard a preview of the parties' arguments contained in the papers. The Court set aside time to hold a potential oral argument or suppression hearing, (*see* D.E. No. 20), but decided to address the pending motions on the papers.

## II.    DISCUSSION

McCants contends that the Court should suppress the evidence seized from his person on June 28, 2015. According to McCants, "an unreliable and uncorroborated anonymous tip is insufficient to provide the reasonable suspicion necessary to justify an investigatory stop." (Def. Mov. Br. at 1). McCants believes that the officers in the instant case were required to corroborate the information derived from the Caller. (*Id.* at 2).

McCants also files certain pretrial discovery motions. Specifically, McCants moves for: (1) *Brady* and *Giglio* material: (2) Rule 404(b) evidence; (3) expert reports and summaries; (4) Jencks Act material; (5) a hearing regarding McCants's prior convictions; and (6) permission to file additional pretrial motions.

The Court will address each motion in turn.

4

A.      **Motion to Suppress**

Upon a motion to suppress, "the government bears the burden of showing that each individual act constituting a search or seizure under Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005) (citation omitted).  The government must establish that the search or seizure was reasonable by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  To be reasonable under the Fourth Amendment, searches and seizures "must be effectuated with a warrant based on probable cause."  *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).  However, under *Terry v. Ohio*, 392 U.S. 1 (1968), "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Any evidence that is obtained during a *Terry* stop without reasonable suspicion must be suppressed as "fruit of the poisonous tree."  *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citations omitted).

The first step in a Fourth Amendment analysis is to determine whether a seizure occurred.  *See United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008).  Here, the government concedes that McCants was seized.  (Gov't Opp. Br. at 10).  Thus, the Court need not address this issue.

Given that a seizure occurred, the Court must next determine whether it was based upon "reasonable, articulable suspicion that criminal activity [was] afoot."  *Wardlow*, 528 U.S. at 123.  "Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  *Id.*  Nevertheless, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Id.* (citing *United*

*States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Generally, "[a]n officer's objective basis for suspicion must be particularized because 'the demand for specificity in the information upon which police action is predicated is the central teaching of . . . Fourth Amendment jurisprudence." *Brown*, 448 F.3d at 247 (citing *Terry*, 392 U.S. at 22 n.18).  However, the Court "must allow 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  In evaluating reasonable suspicion, the court must consider "the totality of the circumstances—the whole picture." *Sokolow*, 490 U.S. at 8.

Here, the officers' reasonable suspicion to stop and frisk McCants was not based on their own observations.  Rather, the officers' suspicion was derived from an anonymous 911 call.  "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *see Alabama v. White*, 496 U.S. 325, 329 (1990)).  Nevertheless, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.* (citing *White*, 496 U.S. at 327).  Accordingly, the Court must determine whether the anonymous call in the instant case exhibits "sufficient indicia of reliability." *Id.*

In *Florida v. J.L.*, the Supreme Court employed a totality of the circumstances standard to determine indicia of reliability.  There, an anonymous 911 caller reported that a young black male was standing at a bus stop wearing a plaid shirt and carrying a gun. *Id.* at 268.  The anonymous tip was not recorded. *Id.*  Upon arrival at the bus stop, two officers saw three black males—one

6

of whom was wearing a plaid shirt.  *Id.*  Importantly, however, none of the officers had a reason to suspect illegal conduct—aside from the tip.  *Id.*  One of the officers approached the man in the plaid shirt and conducted a frisk, which revealed a gun contained in his pocket.  *Id.*

Ultimately, the Supreme Court held that the tip lacked indicia of reliability.  In particular, the Supreme Court held that the tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility."  *Id.* at 271.  Moreover, the Supreme Court noted that an accurate description of a subject's readily observable location is reliable in that it helps police correctly identify the accused.  *Id.*  Such a tip does not, however "show that the tipster has knowledge of concealed criminal activity."  *Id.*  Indeed, "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality."  *Id.*

More recently, the Supreme Court affirmed a lower court decision finding that a 911 emergency call provided sufficient indicia of reliability.  In *Navarette v. California*, highway patrol received a 911 call in which the tipster indicated that she was run off the road approximately five minutes earlier.  134 S. Ct. 1683, 1686-87 (2014).  The tipster was able to provide the make, model, and license plate number of the vehicle that ran her off the road.  *Id.* at 1686.  The Supreme Court held that this call provided indicia of reliability.  *Id.*

In particular, the Supreme Court noted that the tipster observed the dangerous driving firsthand, which entitled the tip to great weight.  *Id.* at 1689 (citing *Illinois v. Gates*, 234 U.S. 213, 234 (1983) ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.")).  The Supreme Court contrasted this with *J.L.*, where the tipster failed to provide a reason for concluding that he or she actually saw the gun.  *Id.*  Along the same lines, the *Navarette* call was a "sort of contemporaneous report [which] has long been treated as especially

7

reliable." *Id.* at 1689; *see Torres*, 534 F.3d at 211 (finding indicia of reliability where "the tipster was an eyewitness who had recently witnessed the alleged criminal activity" (citation omitted)).

Notably, the Supreme Court avoided drawing hard lines with respect to determining reliability. Indeed, the Supreme Court indicated that "[t]he facts of [*J.L.*] do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." *J.L.*, 529 U.S. at 273-74.

Following *J.L.*, but prior to *Navarette*, the Third Circuit enumerated five factors for courts to consider when addressing the reliability of a tip: (1) whether the tip was relayed to an officer through a face-to-face interaction with an informant; (2) whether the informant can be held responsible if her allegations turn out to be fabricated; (3) whether the tip contains information that would not be available to just an observer; (4) whether the person providing the tip has recently witnessed the alleged criminal activity; and (5) whether the tip includes predictions that can be corroborated. *See Brown*, 448 F.3d at 249-50. To be sure, the Court need not apply the *Brown* factors in a formulaic manner because "no single factor is dispositive or even necessary to render an informant's tip reliable." *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010) (citing *Torres*, 534 F.3d at 211 ("[A] tip need not bear all of the indicia—or even any particular indicium—to supply reasonable suspicion.")). "Indeed, 'a deficiency in one [factor] may be compensated for . . . by some other indicia of reliability." *Torres*, 534 F.3d at 213 (citing *Gates*, 462 U.S. at 233) (alteration in original).

8

McCants contends that this case is controlled by *J.L.* (Def. Mov. Br. at 9). According to McCants, the tipster in the instant case did not provide predictive information and failed to demonstrate her knowledge of concealed criminal activity. (*Id.*). In particular, McCants argues that, as in *J.L.*, the tipster did not explain how she or he knew about the gun. (*Id.*). McCants also argues that the officers failed to corroborate the tipster's indication that the accused was "about to kill" the woman. (*Id.* at 10). Rather, Fulton did not reveal that she and McCants were involved in an argument until after McCants was searched. (*Id.* at 9; D.E. No. 14-4, Ex. D, East Orange Police Dep't Supplementary Incident Report, Officer Wreh; D.E. No. 14-4, Ex. D. East Orange Police Dep't Supplementary Incident Report, Officer Singleton).[1]

Despite McCants's arguments, the Court concludes that the anonymous 911 tip did contain sufficient indicia of reliability. To begin, the instant case is starkly distinct from *J.L.* Although this is not the preverbal suspect with a bomb that was discussed in *J.L.*, it is easily distinguishable from a man simply standing at a bus stop with a concealed weapon. In *J.L.*, "[t]here was no indication that the tip . . . was contemporaneous with the observation of criminal activity." *See Navarette*, 134 S. Ct. at 1690. Here, the Caller provided an eyewitness account of an ongoing domestic dispute; there was contemporaneous observation of criminal activity. The tip was primarily about a domestic violence incident. The focus of the anonymous call was not simply about a man in possession of a gun, which differentiates this tip from *J.L.*

Moreover, the fact that the anonymous caller did not provide predicative information is of no moment to the Court. Providing predictive information is not a requirement to establish

---

[1] The Court has reviewed the government's position that McCants and Fulton were "yelling at each other" and "arguing with each other" when the police arrived. (Gov't Opp. Br. at 5). The record is devoid of any facts to support this position. Nevertheless, the Court declines to consider either parties' position as to this disputed fact.

reliability.  Rather, providing predictive information that the police can corroborate is one of many indicia of reliability, but it need not be present.  *See Torres*, 534 F.3d at 213.

The instant case is strikingly similar to *United States v. Wooden*, 551 F.3d 647 (7th Cir. 2008).  There, the South Bend, Indiana 911 system received a call indicating that a black male had a silver gun.  *Wooden*, 551 F.3d at 648.  The caller went on to state that the black male was arguing with his girlfriend while they were walking towards 7-Eleven.  *Id.*  The caller described the accused as tall and stated that he was wearing a black jacket with blue jeans.  *Id.*  Importantly, the caller indicated that the accused had a gun in a holster and provided an eyewitness account that he pulled it out.  *Id.*

Upon arriving at the scene, the police spotted a couple but did not see an ongoing argument.  *Id.*  Rather, the couple was eating snacks.  *Id.* Nevertheless, the officers stopped the defendant, conducted a pat down, and found a gun.  *Id.*

The Seventh Circuit held that the 911 call provided articulable suspicion for a stop and frisk.  In particular, the Seventh Circuit noted that in certain situations, such as in *J.L.*, police can take the time to gather further information.  *Id.* at 650.  However, some situations imply a need for dispatch.  *Id.*  Particularly, the Seventh Circuit noted that "domestic violence comes and goes; a man who pulls a gun on his wife or girlfriend may do it again at any moment.  (There is also a risk that an armed man may threaten the woman with him that, unless she acts natural when the police arrive, she will be beaten or shot later.)"  *Id.*

In addition, the Seventh Circuit touched upon the anonymity of the call.  First, the Circuit noted that, "as a practical matter[,] a name given by a caller does not make the tip less anonymous." *Id.* at 649.  Indeed, a caller can indicate that his name is John Smith, but that does not mean that he or she is John Smith.  *See id.* ("Suppose that the 911 call in this case had begun: 'My name is

John Jenkins . . . .' That a caller gives a name does not mean that he *is* John Jenkins.").  Moreover, the Circuit noted that "[a] 911 system designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress."  *Id.* at 650.

Much like in *Wooden* and *Navarette*, the anonymous call in the instant case bore indicia of reliability.  To begin, it is clear that the Caller was providing a firsthand account of an ongoing crime because the Caller stated "he's beating her up really bad *right now* I wanna [sic] break—I wanna [sic] break it up but, I don't wanna [sic] do nothing."  (911 Call at 0:00:46-0:00:56 (emphasis added)).  This supports the conclusion that the Caller was an eyewitness to an ongoing domestic violence crime, thus establishing one of the five *Brown* factors—whether the tipster "recently witnessed the alleged criminal activity."  *See Brown*, 448 F.3d at 249-50; *see also Navarette*, 134 S. Ct. at 1689 (affording great weight to a tipster that observed dangerous driving firsthand).  The Court concludes that this factor weighs heavily in favor of reliability.

Second, the Caller's use of the 911 emergency system provided further reliability.  *See Navarette*, 134 S. Ct. at 1689 (holding that use of the 911 emergency system provided further reliability because the system includes features that allows for tracing calls, "and thus provide[s] some safeguards against making false reports with immunity").  The Caller's failure to provide a name or identity does not necessarily weigh against reliability.  The Caller did not attempt to conceal her identity; in fact, the dispatcher failed to ask.  *See Torres*, 534 F.3d at 211 (noting that tipster did not attempt to conceal identity; dispatcher simply failed to ask).  Courts have routinely declined to require police to undergo extensive credibility checking.  *See id.*  ("[W]e do not fault the officers' choice to forgo extensive credibility checking in order to quickly respond.  The business of policemen and firemen is to *act*, not speculate or meditate on whether the report is

11

correct.  People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process."); *see also Wooden*, 551 F.3d at 650 ("A 911 system designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress.").  Thus, the Caller's use of the 911 emergency system further supports reliability, despite remaining anonymous.

Along the same lines, use of the 911 system supports another *Brown* factor—whether the informant can be held responsible if her allegations turn out to be fabricated.  *See Brown*, 448 F.3d at 249.  The Supreme Court has indicated that, "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."  *Navarette*, 134 S. Ct. at 1689.  Indeed, "given . . . technological and regulatory developments, . . . a reasonable officer could conclude that a false tipster would think twice before using such a system."  *Id.* at 1690.  Thus, the Court concludes that this *Brown* factor weighs in favor of reliability.

Third, the Caller's accurate description—of both the accused and the location—further support reliability.  Although an accurate description of appearance and location do no demonstrate that a tipster has knowledge of criminal activity, "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse."  *J.L.*, 529 U.S. at 272.

Here, the Caller described the accused as a male wearing a red hat with braids, (911 Call at 0:00:46-0:00:56), located at Grove Street and Williams, (*id.* at 0:00:42-0:00:44).  Officer Sangster was the first to notice a "male with dreads and a red hat walking north on N. Grove St at the intersection with Grove Pl. with a female . . . ."  (Sangster Report).  Officer Sangster relayed his location and responding Officers Patterson and Rochester stopped McCants.  (*Id.*).  There is no

dispute that McCants fit the description.  (Def. Mov. Br. at 1).  To be sure, McCants was apprehended at 146 Grove Street, wearing a red hat with dreadlocks, and was found with a woman. (Rochester Report).  Although these descriptions do not speak to illegality, they assisted the police in locating the accused.  Taken alone, an accurate description would not be enough, but when coupled with other factors, the accurate description in the instant case added indicia of reliability and bolstered the Caller's credibility.  Accordingly, the Court concludes that the Caller's accurate description of appearance, locality, and the accused's companion further support reliability.

The time between the Caller's tip and the officers' arrival on the scene at 146 Grove Street also supports reliability.  Indeed, when the East Orange 911 emergency system received the call at approximately 2:38 p.m., there were a number of officers in the area surrounding 146 Grove Street.  (Gov't Opp. Br. at 4; *see also* Sangster Report (indicating that the call was received at "approximately 1430 hours"); Rochester Report (indicating that the call was received at "1436 hrs.")).  Within seconds of the 911 dispatcher indicating that the Caller disconnected, a responding officer in the area stated, "I think I just passed him.  He has uh, uh a white tank top."  (D. E. No. 14-4, Ex. B 911 Dispatch Communication at 2:00-2:03).  Seconds later, an officer indicated that "we have him here."  (911 Dispatch Communication at 2:20-2:22; Def. Mov. Br. at 4).  Approximately a minute after indicating that the officers "have him," an officer can be heard over the dispatch asking Officer Singleton whether he recovered a "one-fifty," to which an officer replied that "it's in his fanny pack." (*Id.* at 3:14-3:22).  Moreover, Officers Rochester and Patterson reported that they were on patrol at "122 Eaton Pl.," which is in "close proximity" to Grove and Williams.  (Rochester Report).  The officers were able to respond within "minutes after the 911 call was made" to 146 Grove Street and corroborate the accused's description.  (*See* Gov't Opp. Br. at 5; Def. Mov. Br. at 4).  This close temporal proximity between the Caller's tip and the

officers' arrival at the scene to find a man fitting the accused's description further supports reliability.

The Court cannot consider the totality of the circumstances without also considering the undeniable fact that the call in the instant case involved a domestic violence dispute with a gun. McCants contends that "[n]one of the six reports contains information indicating that Mr. McCants was observed beating a woman or doing anything that suggested he had a gun." (Def. Mov. Br. at 10). However, as the Seventh Circuit noted, domestic violence comes and goes. *See Wooden*, 551 F.3d at 650. Along the same lines, "a man who pulls a gun on his wife or girlfriend may do it again *at any moment*. (There is also a risk that an armed man may threaten the woman with him that, unless she 'acts natural' when the police arrive, she will be beaten or shot later.)" *Id.* (emphasis added). For the Seventh Circuit, the domestic violence tip implied a need for dispatch because it "arise[d] from a recorded 911 call that revealed how the caller knew about the crime," which is analogous to the instant case. *See id*. Thus, the fact that the police did not observe McCants beating Fulton, or observe any physical evidence of domestic violence, is of no moment for the Court.[2] What is relevant, however, is the allegation of domestic violence coupled with the possession of a firearm. The Court must allow the officers to draw inferences from their experience and specialized training. *See Brown*, 448 F.3d at 247. And it is indeed plausible to infer that McCants ceased attacking Fulton before the police arrived and left no physical evidence or injuries.

---

[2] The Court is aware of the dispute as to Fulton and McCants's interaction when the officers arrived. However, the Court determined that this dispute was not material enough to warrant a suppression hearing. Indeed, the facts discussed in this Opinion—without consideration of Fulton and McCants's interaction— are enough to warrant a denial of the motion to suppress. And even when accepting McCants's position as true, denial is still warranted.

Accordingly, the Court concludes that the Caller's anonymous tip bore sufficient indicia of reliability.  As such, the tip provided reasonable suspicion for the officers to engage in a *Terry* stop.  McCants's motion to suppress the evidence seized from the June 28, 2015 *Terry* stop is thus denied.

**B.     Pretrial Discovery Motions**

On his pretrial discovery motions, McCants moves for: (1) *Brady* and *Giglio* material: (2) Rule 404(b) evidence; (3) expert reports and summaries; (4) Jencks Act material; (5) a hearing regarding McCants's prior convictions; and (6) permission to file additional pretrial motions.

*1.     Brady and Giglio Material*

McCants seeks the disclosure of *Brady* and *Giglio* material.  (Def. Mov. Br. at 12-14). Pursuant to *Brady v. Maryland*, the government has a duty to disclose impeachment and exculpatory evidence.  *See Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  A subset of *Brady* material includes disclosure of "materials that go to the question of guilt or innocence as well as materials that might affect the jury's judgment of the credibility of a crucial prosecution witness."  *United States v. Friedman*, 658 F.3d 342, 357 (3d Cir. 2011); *see Giglio v. United States*, 405 U.S. 150, 154 (1972).  As McCants concedes, there is no set time for disclosure, (Def. Mov. Br. at 14), but "the government must disclose *Brady* material sufficiently in advance of trial to enable the defendant to use the evidence in a meaningful fashion."  *Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 114 (3d Cir. 2010).

On the instant motion, McCants requests that the government disclose "identifying information on all agents and law enforcement personnel involved in the investigation of this matter and the arrest of Mr. McCants."  (Def. Mov. Br. at 13).  In response, the government asserts

that it is not in possession or aware of any exculpatory evidence.  (Gov't Opp. Br. at 25).    As such, it is clear that the government is not under any *Brady* disclosure obligations.  As for *Giglio*, the government asserts that it will disclose such information as set forth in the October 28, 2015 Discovery Order.  (D.E. No. 6 Discovery Order ("Discovery Order")).  The Discovery Order requires the government to disclose *Giglio* material "sufficiently in advance of the witness's testimony to avoid delay in the trial."  (*Id.* ¶ 4).  Given that the government will disclose *Giglio* material in a timely fashion for trial, the Court denies McCants's motion.

In addition, McCants seeks information regarding evidence that was lost or destroyed. (Def. Mov. Br. at 14).  The government contends that it is unaware of any evidence that has been lost or destroyed.  (Gov't Opp. Br. at 25).  Accordingly, the Court denies this request as moot.

### 2.    *404(b) Evidence*

McCants seeks notice of Federal Rule of Evidence 404(b) evidence prior to trial.  (Def. Mov. Br. at 14).  Pursuant to Rule 404(b), evidence of a crime, wrong, or other act is admissible for the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accidence.  Fed. R. Evid. 404(b)(2).  However, upon request of the defendant, the government must provide reasonable notice of such 404(b) evidence prior to trial. Fed. R. Evid. 404(b)(2).

The government contends that it will comply with 404(b) disclosure requirements pursuant to the Discovery Order.  (Gov't Opp. Br. at 26).  Given the government's representation, which is in compliance with Rule 404(b), the Court finds no need to order the government to disclose such evidence any earlier.  Indeed, a trial date has yet to be set.  Accordingly, the Court denies McCants's motion as premature.

3.    *Expert Testimony*

McCants contends that, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E), the government must produce all expert tests and reports, as well as summaries of expert testimony. (Def. Mov. Br. at 15).  McCants also contends that the government must provide adequate notice of the use of any expert witness.  (*Id.*).  The government indicates that it has already notified McCants of its intention to call one or more experts to testify regarding the term "firearm"—but that it does not intend on calling any additional experts. (Gov't Opp. Br. at 27).  Based on the government's representations, the Court denies McCants's motion as moot.

4.    *Jencks Material*

McCants seeks the production of all statements by witnesses that constitute Jencks Act material. (Def. Mov. Br. at 16).  The Jencks Act requires the government to produce any statement made by a government witness in its possession *after* the witness testifies on direct examination. *See* 18 U.S.C. § 3500.  Thus, McCants's request for Jencks material is premature.

Nevertheless, the government has agreed to produce Jencks material "sufficiently in advance of the witness's testimony to avoid delay in trial."  (Discovery Order ¶ 4).  In fact, the government represents that it will produce Jencks material at least three days prior to testimony of each government witness.  (Gov't Opp. Br. at 27).  Thus, the Court denies McCants's motion as premature.

5.    *Prior Convictions*

Pursuant to Federal Rule of Evidence 104(c), McCants requests a hearing to determine the admissibility of his prior convictions under Federal Rule of Evidence 609.  (Def. Mov. Br. at 16). The government does not oppose this request.  (Gov't Opp. Br. at 29).

The Court reserves ruling on this issue for a date closer to trial.  In particular, the Court orders the parties to address any prior convictions and Rule 609 concerns in their respective motions *in limine*.

> 6.    *Additional Motions*

McCants requests leave to file additional pretrial motions if necessary.  (Def. Mov. Br. at 17).  The government does not object.  (Gov't Opp. Br. at 30).

Given this agreement, the Court concludes that either party may request leave of the Court to file additional pretrial motions, which the Court will review on a request-by-request basis.  This does not include *in limine* motions, for which the Court will set a briefing schedule prior to trial.

## III.    CONCLUSION

For the foregoing reasons, the Court denies McCants's motion to suppress and pretrial discovery motions—with the exception of McCants's motion for a Rule 104(a) hearing and request to file additional motions as necessary, on which the Court reserves judgment.  An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**